# Ex parte R. J. HOUSE v. JOEL B. MAYES, etc.

### In Banc, April 26, 1910.

1. **SELLING GRAIN: Deducting One Hundred Pounds: Right of Contract: Constitutionality: Criminal Prosecution.** The Act of 1909 (Laws 1909, p. 519) has two aspects, one civil, and the other criminal, and the criminal part, which fully defines a criminal offense, provides that "any purchaser of grain, seed, hay, or coal, who shall deduct any amount from the actual weight or measure thereof, under claim of right to do so, by reason of any custom or rule of a board of trade, or any pretense whatever, shall be guilty of a misdemeanor;" and the agreed statement showing that petitioner does not claim that he has any contract with the seller to deduct one hundred pounds from the weight of the car of wheat, but claims the right to make such deduction only because a rule of the board of trade of which he is a member says that "an allowance of one hundred pounds per car shall be made to the buyer to cover loss on account of dirt and other foreign matter," and such deduction, without the consent of the seller, being the offense for which the buyer is being prosecuted, he cannot be heard to contend that the statute is unconstitutional as an unwarranted interference with his right to contract. There is no question of contract in the case. The civil feature of the statute is not involved. Even if it were invalid its invalidity would not render the penal clause void.

   *Held*, by GRAVES and FOX, JJ., with whom VALLIANT, C. J., concurs, that the civil and criminal features of the statute cannot be separated; that the purpose of the statute is to make any deduction from any sale, because of dirt or foreign substances or for any other reason, a misdemeanor; that there can be no sale without a contract, and to make criminal a contract for a reasonable deduction from the actual weight of any commodity because of dirt or other foreign substances therein, is to interfere with the constitutional right of persons *sui juris* to make a reasonable contract; and that the statute cannot be confined to sales made on board of trade, but applies to all sales of commodities therein named, and prohibits any deduction from the actual weight for "any pretense whatsoever."

2. ——: ——: **Police Regulations.** The inspection of weights and measures are within the police powers of the State, and laws passed by the General Assembly providing for such inspection and regulation and requiring dealers and traders to

conform thereto are not repugnant to the Constitution. The General Assembly has power to prevent a board of trade, by a rule made by itself and without other authority, from taking and appropriating to its members, without the knowledge and consent of the consignor, one hundred pounds of the weight of every carload of grain purchased by them on said board, whether the same be clean or contain dirt, and to make such appropriation a misdemeanor. Such a statute is clearly akin to fraudulent weighing.

*Held*, by GRAVES, J., with whom VALLIANT, C. J., and FOX, J., concur, that a statute which says that no contract for the sale and delivery of certain commodities can be made between persons *sui juris* unless the actual weight of the carload or other bulk be taken as the basis of the contract, is an unreasonable and unconstitutional exercise of the police power of the State; and the Act of 1909, Laws 1909, p. 519, makes it a crime for such persons to contract for a reasonable deduction from the weight of commodities because of dirt or other foreign substances, and should therefore be held void.

3. ———: ———: **Title to Act.** The charge of having deducted one hundred pounds from the weight of an ordinary carload of wheat purchased by one dealer from another on a board of trade, without any other authority than that of a rule of said board permitting or authorizing him to do so, in total disregard of whether or not the wheat contained dirt or other foreign substance, and in total disregard of the seller's consent to such reduction, aptly falls within the title of an act whose purpose is declared therein to be "to prevent fraud in the purchase and sale of grain and other commodities."

*Held*, by GRAVES, J., with whom VALLIANT, C. J., and FOX, J., concur, that it is not a fraud for two parties *sui juris* to agree that one will sell and the other will buy a carload of grain, provided one hundred pounds be taken from the actual weight to cover loss occasioned by the presence of foreign substances, and the body of an act which simply provides that the actual weight of the grain shall be taken as the basis of the contract of sale does not respond to a title which declares the purpose of the act to be "to prevent fraud in the purchase and sale of grain and other commodities."

4. ———: ———: ———: **Without Just Compensation.** A law which prohibits a purchaser of wheat from a commission dealer from appropriating one hundred pounds of wheat from each carload, or, what in effect amounts to the same thing, from deducting one hundred pounds from the weight of each carload bought by him without the shipper's consent, whether or not it

in fact contains dirt, does not deprive him (the purchaser) of his property without just compensation. The rule is the other way; to prohibit him from making such appropriation is to prevent him from taking the shipper's property without just compensation. And a rule of a board of trade authorizing such an appropriation in its practical effects means that the members of the board may take private property without just compensation, and a law nullifying such rule is valid.

## Habeas Corpus.

WRIT DENIED.

*Frank Hagerman* and *Kimbrough Stone* for petitioner.

The law is invalid as an unauthorized invasion of the liberty of the citizen. The State is not infringing upon that liberty when it exercises its police power to confine the freedom of the individual for the protection of the State or of the safety, health, morals or welfare of the general public. The objects of the police power can be stated only in a general way, but may be defined to be the protection of the safety, health, morals or welfare of the general public. Adair v. United States, 208 U. S. 173. But the Legislature can interfere with the liberty of the citizen only insofar as necessary to accomplish these ends, for there is a limit beyond which it may not go in the regulation of the affairs of the individual. It cannot, through the guise of an exercise of the police power, invade that liberty of the citizen which the fundamental law has declared to be unassailable. State v. Julow, 129 Mo. 163; Lochner v. New York, 189 U. S. 45. While large discretion is necessarily vested in the Legislature to determine what the interests of the public require and what measures are necessary to protect those interests, yet to justify the State in interposing its authority in behalf of the public, it must appear that the interests of the public generally require such interferences, and also that the means used for the accomplishment of that purpose are

reasonably necessary and not unduly oppressive upon individuals. State v. Cantwell, 179 Mo. 263; Lawton v. Steele, 152 U. S. 136; Guthrie's Fourteenth Amendment, p. 76; Yick Wo. v. Hopkins, 118 U. S. 368; Minnesota v. Barber, 136 U. S. 313; Collins v. New Hampshire, 171 U. S. 34. (2) Your petitioner urges that in the present instance no public interest or purpose has been served, that neither the safety, health, morals nor welfare of the public has been protected, but that his private business rights—his liberty to contract—have been arbitrarily interfered with in an unnecessary and unreasonable manner. The alleged purpose of this act was to prevent fraud. The manner in which the law seeks to prevent this alleged fraud is to make it a crime for any purchaser of grain, seed, hay or coal to ''deduct any amount from the actual weight or measure thereof under claim of right to do so by reason of any custom or rule of a board of trade or any pretense whatsoever.'' Obviously the statute regards a deduction by the purchaser from the weight of grain under a custom or rule of a board of trade as a fraud requiring legislative prevention. Plainly if no semblance of fraud is present in such a transaction, if the deduction is based upon sound and fair business conditions, then the Legislature cannot prevent such a practice merely by declaring it fraudulent. Fraud cannot exist without deception. There can be no fraud where no one is or can be deceived. The facts of the present case, which are not only typical of but identical with all transactions within the State where a deduction is made ''by reason of any custom or rule of a board of trade,'' show that every circumstance surrounding the deduction is open and a matter of record. There is no concealment and no deceit. There is just as little reason for interference on the theory that there is fraud in the transaction because there is no real ground for making the deduction, although it may be made openly. The facts show that the rule is the result of what both buyers and sellers

in a great market have determined to be a just rule to govern their sales in that market. It was enacted by them "to secure the buyer from loss through dirt and foreign matter in or swept out with the grain which was unloaded at Kansas City," and "the one hundred pound quantity was taken as a fair average" of the "loss from dirt and foreign matter, varying with different cars, which is not fully taken care of in the grade," because "there is no method in use of accurately determining the percentage of such foreign matter and dirt." There must be some "reasonable ground" for the legislative interference or it cannot be justified. State v. Vandiver, 121 S. W. 45; State ex rel. v. Standard Oil Co., 218 Mo. 379; Lumber Co. v. Railroad, 216 Mo. 675; Lohse Co. v. Fuelle, 215 Mo. 453; St. Louis v. Glover, 210 Mo. 512; St. Louis v. DeLassus, 205 Mo. 586; State v. Weber, 205 Mo. 47; State ex rel. v. McIntosh, 205 Mo. 615; State ex rel. v. Miles, 210 Mo. 127; St. Louis v. Dairy Co., 190 Mo. 485; St. Louis v. Dairy Co., 190 Mo. 504; State v. Lower, 185 Mo. 99; State v. Tie Co., 181 Mo. 555; State v. Cantwell, 179 Mo. 263; St. Louis v. Packing Co., 141 Mo. 375; Railroad v. Jacobson, 179 U. S. 301; Lochren v. New York, 198 U. S. 45; Adair v. United States, 208 U. S. 161; Ritchie v. People, 155 Ill. 98. The Legislature cannot declare to be fraudulent that which in its nature is not fraudulent. St. Louis v. Galt, 179 Mo. 18; State v. Julow, 129 Mo. 175. Despite its general language, this law was aimed at one thing and that alone. It was intended to abolish the hundred pound deduction in carload grain sold on the floor of the board of trade of Kansas City. Certain elevator men, not members of the board of trade, nor grain raisers, nor producers, nor even citizens of the State, knew that they could not send their grain to that market and escape a dockage on the carload for dirt in the grain and car. The only possible result the law could have, if any, would be to compel the buyer of grain to accept it upon terms which are different

from those which obtained when the parties were left
to do their own bargaining. It is the necessary ope-
ration—the natural and reasonable effect of a statute,
that determines not only the motives of the Legislature,
but the validity of the law. Henderson v. New York
City, 92 U. S. 268; Soon Hing v. Crowley, 113 U. S. 710;
Mugler v. Kansas, 123 U. S. 661; Minnesota v. Barber,
136 U. S. 313. Assuredly it is serving no public interest
for the State to aid either party in an ordinary commer-
cial sale by restricting the freedom of the other party.
On its face this law is intended to hamper the making
of such contracts and it does of necessity do so. It thus
interferes with those who desire to enter into such con-
tracts, and being unnecessary and without public pur-
pose, it is an unlawful interference with that liberty
guaranteed by the National and State constitutions.
Statutes which made unlawful contracts of employment
forbidding membership in labor unions have been uni-
versally held void. State v. Julow, 129 Mo. 163; People
v. Marcus, 189 N. Y. 257; Gillespie v. People, 188 Ill.
176; Coffeyville Co. v. Perry, 69 Kas. 297; State v.
Bateman, 7 Ohio N. P. 487; Ex rel. Zillmer v. Kreutz-
berg, 114 Wis. 530; Goldfield Mines Co. v. Miners'
Union, 159 Fed. 500. Acts requiring stipulations in
contracts for public work that none but union labor be
employed are void. Atlanta v. Stein, 111 Ga. 789; Mar-
shall Co. v. Nashville, 109 Tenn. 495; Adams v. Bren-
nan, 177 Ill. 194; Holden v. Alton, 179 Ill. 318; Fiske
v. People, 188 Ill. 206; State ex rel. v. Toole, 26 Mont.
22; Lewis v. Board of Education, 139 Mich. 306; People
ex rel. v. Coler, 166 N. Y. 1. Acts requiring public con-
tractor to pay certain minimum wages are void. Street
v. Electrical Supply Co., 160 Ind. 338; State v. Norton,
5 Ohio N. P. 183. Acts regulating the time of pay-
ment of wages in defiance of contract are held invalid
in Leep v. Railroad, 58 Ark. 427; Coal Co. v. People,
147 Ill. 66; Railroad v. Wilson, 19 S. W. 910; Republic
Co. v. State, 160 Ind. 379; Commonwealth v. Isenburg,

4 Pa. Dist. R. 579; Bauer v. Reynolds, 3 Pa. Dist. R. 502. Laws prohibiting payment of laborers otherwise than in money are void. State v. Loomis, 115 Mo. 307; State v. Goodwill, 33 W. Va. 179; Godcharles v. Wigeman, 113 Pa. 431; State v. Hann, 61 Kas. 146; State v. Jordan, 103 S. W. 633; Coal Co. v. Commonwealth, 96 Ky. 218. Acts prohibiting mine owners from dealing in supplies, provisions, etc., are held void. Froer v. People, 141 Ill. 171. Acts forbidding sale of supplies to employees at greater price than to others are void. State v. Fire Creek Co., 33 W. Va. 118. Acts forbidding deduction of wages because of defective work are held void. Com. v. Perry, 155 Mass. 117. Acts to prevent deduction from wages except for actual cash advanced are held void. Coal Co. v. Harrier, 207 Ill. 624. Acts requiring employers to give discharged employees written reasons for discharge are void. Wallace v. Railroad, 94 Ga. 732; Railroad v. Schaffer, 65 O. 414. A general eight hour law held void. Low v. Rees Printing Co., 41 Neb. 127. Statute requiring sleeping-car companies, upon request of occupant of lower berth, to raise upper berth if not occupied, held void. State v. Redmon, 114 N. W. 137. Act requiring all contractors for erection of buildings to give bond for benefit of material men held void. Montague & Co. v. Furness, 145 Cal. 205. Act forbidding cigar making in tenement houses void. In re Jacobs, 98 N. Y. 98. Ordinance regulating weight of loaves of bread. Buffalo v. Baking Co., 39 App. Div. (N. Y.) 432. Statute giving State board power to refuse to grant nurseryman's license as it might think applicant "financially responsible" or not, held void, because no reason why such qualification should be required, hence not within police power to require it. State ex rel. v. Nelson, 115 N. W. 93. Act requiring certain bonds to be secured by surety companies held void. State ex rel. v. Robins, 71 Ohio 273. Sunday barber act void. Eden v. People, 161 Ill. 296. Act forbidding use of flag as advertisement. Ruhstrat

v. People, 185 Ill. 133. Ordinance prohibiting location of laundry without consent of certain property-owners. Ex parte Sing Lee, 96 Cal. 354. Laundry Ordinance case, 13 Fed. 229. Ordinance prohibiting laundry unless permitted by board of supervisors. Yick Wo v. Hopkins, 118 U. S. 373. Act requiring production of certificate showing payment of all taxes due before recording conveyance of real estate. State ex rel. v. Moore, 7 Wash. 173. Act forbidding sale of groceries and provisions in same store where dry goods, clothing or drugs are sold is void. Chicago v. Nitcher, 183 Ill. 104. Act making gift of premium stamps with purchase a crime held void. People ex rel. v. Zimmerman, 102 N. Y. App. 103; Madden v. Dycker, 72 App. Div. (N. Y.) 308. Act prohibiting selling of any article upon inducement of a premium, held void. People v. Gillison, 109 N. Y. 397. Act requiring mine owners to provide scales for weighing coal and to make the weight of coal the basis of wages, held void. Millett v. People, 117 Ill. 294; In re House Bill No. 203, 21 Colo. 27. Act requiring payment for coal mining to be based on coal before screened, void. Ramsey v. People, 142 Ill. 380; Re Preston, 63 O. St. 428; Fuel Co. v. People, 175 Ill. 51; Harding v. People, 160 Ill. 459. Act making it criminal to offer real estate for sale without written authority held void. Fisher Co. v. Woods, 187 N. Y. 90. An act putting onerous restrictions upon keeping of private asylums for insane. Ex parte Whitwell, 98 Cal. 73; Commonwealth v. Campbell, 117 S. W. 383.

*Elliott W. Major,* Attorney-General, and *John M. Atkinson,* Assistant Attorney-General, for the State.

(1) The act under which petitioner is prosecuted is a valid act as a police regulation requiring that all sales of grain, seed, hay and coal shall be made on the basis of the actual weight thereof for the purpose of preventing fraud in the sales of such commodities. Police power defined: 4 Bl. Com. 162; Cooley, Const. Lim.,

572; 1 Tiedeman, Police Power, sec. 1, p. 2; 22 Am. and Eng. Ency. Law (2 Ed.), 916; 8 Cyc. 863; Munn v. Illinois, 94 U. S. 113; State ex rel. v. Mercantile Co., 184 Mo. 184; State v. Searcy, 20 Mo. 490. "From its very nature, the police power is a power to be exercised within wide limits of legislative discretion; and if a statute appears to be within the apparent scope of this power, it would be a usurpation of jurisdiction for the courts to inquire into its wisdom and policy or to undertake to substitute their discretion for that of the Legislature." State v. Addington, 12 Mo. App. 221; State v. Beattie, 16 Mo. App. 131; Cearfoss v. State, 44 Md. 403. "It cannot be claimed that parties have the right to make any and all contracts they deem proper. The State has made and may properly make many regulations that will restrict this right. For instance, we have usury laws, and their validity is unquestioned. Parties are not permitted to insert certain conditions in insurance contracts which would be perfectly legitimate, but for statutory prohibition. Yet the courts sustain these provisions and declare ineffectual any attempt by contract to evade or nullify the statutes." Karnes v. Insurance Co., 123 Mo. 417; Havens v. Insurance Co., 123 Mo. 403; Henry County v. Evans, 97 Mo. 47; Equitable Society v. Clements, 140 U. S. 226. "Any provision of a shipper's contract which limits the time in which suit for injury to stock shall be brought, if that limit is less than the time fixed by statute, is void. Nor is such statute unconstitutional." Richardson v. Railroad, 149 Mo. 311. The Legislature, in the Act of 1909, has a right to require sales of grain, seed, hay or coal to be made on the basis of the actual weight of such properties, and prohibit sales or contracts made on anything less than the actual weight. The act is not special legislation. It applies to and affects all members of the same class—that is, every person engaged in buying or selling the properties mentioned. State v.

227 Sup—40

Swagerty, 203 Mo. 523; State v. Cantwell, 179 Mo. 205. (2) The act in question is presumed to be constitutional until the contrary is clearly shown. Ex parte Loving, 178 Mo. 203; State ex rel. v. Pike County, 144 Mo. 277; State v. Cantwell, 179 Mo. 261; State v. Aloe, 152 Mo. 477; State ex rel. v. Railroad, 48 Mo. 471; Atchison v. Andrews, 174 U. S. 96; County v. Griswold, 58 Mo. 192; State v. Able, 65 Mo. 357. (3) The whole act, stripped of its verbiage, and "boiled down," simply means this: First. That all sales of grain, seed, hay and coal in this State shall be made on the basis of their actual weight. Second. That any purchaser of grain, seed, hay or coal, who shall deduct any amount from the actual weight or measure thereof, under claim of right to do so by reason of any custom or rule of a board of trade or any pretense whatsoever, shall be guilty of a misdemeanor and punished by fine. Third. That no agent or broker shall have any authority by reason of any custom or rule of a board of trade, to sell any grain, seed, hay or coal, except on the basis of the actual weight thereof, and any sale made in violation thereof shall be null and void. Petitioner is charged with the violation of the second part of said sectional division, which is the penal part of said act. (4) The act was not leveled against the right to contract in any manner or form. No one can gainsay that the State under its police power has the right to prevent fraud generally, in any transaction, and especially in weights and measures of the commodities of life. Freund on Police Power. This court will take judicial notice of the fact, which is common knowledge to all, that the great bulk of the grain and other commodities named in the act, are sold on the exchanges of the large cities of this State. The farmer or merchant who ships his grain to such markets is entitled to receive pay for the same on the basis of the actual weight thereof. We dare say that no farmer or merchant who ships his grain to such markets is familiar with the rules of either board of

trade of the cities, such as are set out in the agreed
statement of facts. They ship their grain to commis-
sion men expecting to receive pay for the same on the
actual weight thereof. The act is intended to inculcate
honesty in the great commercial transactions which
take place on such stock exchanges, and to do away with
the arbitrary taking of one's property without pay
and without his consent so to do. The act was passed
to prevent frauds in the sale of such commodities, and
it also tends in a large measure to the well-being of the
State to prevent false weights and measures. Bacon
v. Walker, 204 U. S. 317; State ex rel. v. Savings Assn.,
167 Mo. 495; People v. Wagner, 86 Mich. 599.  (5)
The act, as it is drawn, in no way attempts to abridge
or limit the right of contract. The act would be valid,
we think, even if it went farther and prohibited the
making of any contract for the taking of another's prop-
erty by any arbitrary rule, and not paying anything
therefor. The right of contract is always subject to
certain limitations, which the State may lawfully im-
pose in the exercise of its police power. State v. Cant-
well, 179 Mo. 269; State ex rel. v. Mercantile Company,
184 Mo. 186. The taking of the hundred pounds of
wheat by petitioner by reason of rule 18 of the board
of trade, of which petitioner is a member, is a "swind-
ling contract" as to the owner of the grain, who did not
consent to the taking of the hundred pounds, nor did
he authorize his broker or agent to give the hundred
pounds by reason of said rule 18. From the agreed
statement of facts, it clearly appears that the owner
of the grain had a right to expect, and did expect, to
receive pay for the same on the basis of its actual
weight. It is stated in the agreed statement of facts
that "nothing had been said between the member sell-
ing [agent] and his principal [owner of the grain] as
to the allowance of the hundred pounds." State v.
Snow, 81 Ia. 445. (6) The provisions of the act under

consideration are reasonable and a valid exercise of the police power. The agreed statement of facts in this case shows that both the broker (who sold the grain for his principal to petitioner) and petitioner, were members of the board of trade of Kansas City; that the broker had not been given authority by his principal [the owner of the grain] to give the one hundred pounds by reason of rule 18 of said board of trade. The act makes null and void any agreement on the part of the broker to give the one hundred pounds by reason of such rule or custom. The admitted facts show the act has been violated. In re Martin, 101 Pac. 1006; St. Charles v. Elsner, 155 Mo. 671; Lamar v. Weidman, 57 Mo. App. 507; State v. Wilson, 61 Kan. 22; People v. Wagner, 86 Mich. 594; Yates v. Milwaukee, 12 Wis. 673; Stokes v. New York, 14 Wend. 87; Charleston v. Rogers, 2 McCurd 495; Eaton v. Kegan, 114 Mass. 433.

GANTT, J.—An Act of the General Assembly of Missouri approved June 8th, 1909 (Laws 1909, p. 519), is in these words:

"An Act to prevent fraud in the purchase and sale of grain and other commodities.

"Be it enacted by the General Assembly of the State of Missouri, as follows:

"Section 1. Every sale of grain, seed, hay or coal shall be made on the basis of the actual weight thereof, and any purchaser of grain, seed, hay or coal, who shall deduct any amount from the actual weight or measure thereof under claim of right to do so by reason of any custom or rule of a board of trade or any pretense whatsoever, shall be deemed guilty of a misdemeanor, and shall be subject to a fine of not less than ten dollars nor more than one hundred dollars for each and every offense.

"Sec. 2. No agent or broker selling any grain, seed, hay or coal shall have authority, under claim or right to do so by reason of any custom or rule of board

of trade, to sell any grain, seed, hay or coal only on the basis of the actual weight thereof, and any contract of sale of any grain, seed, hay or coal made in violation of this act shall be null and void.''

On September 21, 1909, the prosecuting attorney of Jackson county, by information in due form, charged the petitioner with a violation of the above act as follows:

''Now comes Virgil Conkling, prosecuting attorney for the State of Missouri, in and for the body of the county of Jackson, and upon his oath informs the court that R. J. House, whose Christian name in full is unknown to said prosecuting attorney, late of the county aforesaid, on the first day of September, 1909, at the county of Jackson, State of Missouri, did purchase, from one James Anderson, one carload of wheat, by weight, and did then and there willfully and unlawfully, from the actual weight of said wheat so by him purchased, take and deduct one hundred pounds, he, the said R. J. House, pretending and claiming to have the right to make such deduction, and to have and keep the said one hundred pounds of wheat so deducted free of charge and cost to him under and by virtue of a rule and custom of the board of trade of Kansas City, contrary to the form of the statute in such cases made and provided, and against the peace and dignity of the State.''

Under a warrant issued upon this information, the petitioner was arrested, and thereafter on September 23, 1909, was granted a writ of *habeas corpus* by the Chief Justice, returnable to the October term of this court, and a return was made on October 12, 1909, justifying his detention by virtue of the said information and warrant. The cause has been submitted to this court upon the following agreed statement of facts:

''Without admission of either party as to the relevancy of any particular fact herein set forth, the following facts are agreed between the parties:

"There are competitive grain markets at Galveston, Texas, Chicago, Illinois, Omaha, Nebraska, Atchison, and Wichita, Kansas, and St. Louis, St. Joseph and Kansas City, Missouri. That Kansas City is a primary grain market. That a very slight difference in price or condition will influence the market course of grain. That the board of trade of Kansas City, Missouri, is a voluntary organization of buyers and sellers of grain and provisions, supported by dues and assessments and maintained for the purpose of furnishing a marketing place where such persons can meet and, under rules of safety and convenience, transact such business. Its objects are: 'To maintain a board of trade to promote uniformity in the customs and usages of merchants; to inculcate principles of justice and equity in business; to inspire confidence in the business methods and integrity of the parties hereto; to collect and disseminate valuable commercial and economic information, and generally secure to its members the benefits of co-operation in the furtherance of their legitimate pursuits, and to promote the general welfare of Kansas City.' Its members are governed by rules and regulations, enacted by the members, and which form part of the written contract of association between them. This organization provides for the exclusive use of its members a trading floor where grain is bought and sold only under and according to said rules. Three of these rules are:

" 'Sec. 16. The weight supervising committee shall have supervision, through the weight department, of the unloading of all cars unloaded at all elevators, mills, warehouses, transfer and team tracks, within the jurisdiction of this board, and shall cause the same to be thoroughly swept and cleaned when unloaded. Sweeping or cleaning of cars subsequently by any operator or employee of any elevator, mill, warehouse, transfer or team track, or by any person or persons under agreement with the same; or the buying or receiv-

ing of any such sweepings or cleanings by any member of this association is prohibited.

" 'Sec. 17. Violation of any of the provisions of section 16 of this article shall subject the member so violating to a fine of fifty dollars for the first offense, to a fine of one hundred dollars for the second offense, to expulsion and forfeiture of membership for the third.

" 'Sec. 18. On all grain bought by members of the Kansas City Board of Trade, and on which Kansas City unloading weights are given, an allowance of one hundred pounds per car shall be made to the buyer to cover loss on account of dirt and other foreign matter.'

"That said board of trade maintains a bureau of weight which strictly enforces rule 16. That rules 16 and 17 were enacted to secure to the seller the full weight of the entire contents of the car, and rule 18 to secure the buyer from loss through dirt and foreign matter in or swept out with the grain which was unloaded at Kansas City. Before grain is sold it is graded. One of the considerations in grading is the dirt and foreign matter in the grain. Experience has shown that there is a loss from dirt and foreign matter, varying with different cars, which is not fully taken care of in the grade. That there is no method in use accurately determining the percentage of such foreign matter and dirt, and the one hundred pounds quantity was taken as a fair average. The members of said board of trade buy and sell sometimes as commission men for outsiders, and sometimes for their own account, and it is impossible to tell without inquiry whether a buyer or seller is acting for himself or for someone else. The buying and selling of grain on the floor of said board of trade is, as in all other markets, based upon the constantly and rapidly fluctuating market price in that and the other principal grain markets. There is no time nor opportunity to ascertain the capacity (principal or agent) in whch a member is acting when he buys or sells, and, if he is really acting as agent, no opportunity

to investigate the financial standing of the real principal. Because of this condition and also to secure the prompt and faithful performance of such contracts of sale, there is a rule of said board of trade forbidding the disclosure of outside principals and holding the member in all cases as the principal. There are also rules making a membership responsible for the faithful performance of such contracts. That the State Railroad and Warehouse Commisson has in force a rule requiring cars unloaded at Kansas City to be cleanly swept. That the method of making the reduction is to weigh the loaded car; then, after emptying and cleanly sweeping the car, to weigh the car; the difference in these two weights is entered on the account sales as the weight of the carload of grain, the deduction of the one hundred pounds being also noted on that slip and settlement made for this balance. That is, the weight of the entire contents of the car is shown and also the one hundred pound deduction on the face of the account sales given the seller.

"That upon the first day of September, 1909, petitioner bought upon the trading floor of said board of trade and from a member thereof, a carload of wheat on Kansas City unloading weights. In accordance with the above method, and under said rule 18, he deducted one hundred pounds and made settlement for the balance.

"The member selling this grain did not own it, but was acting as a commission man. He, however, dealt with petitioner as in his own right, and petitioner had no notice or knowlege that such seller was not the real owner of the grain. Nothing had been said between the member selling and his principal as to the allowance of the one hundred pounds.

"Both petitioner and the seller understood at the time of sale that it was made subject to this rule.

"The petitioner insists that the above act of the Legislature is void and is an unauthorized invasion of

his liberty as a citizen under the Constitution of this State and the Constitution of the United States, in that, it arbitrarily interferes with his right to contract in an unnecessary and unreasonable manner. It will be observed that the information charges an offense under the first section of the act of June 8, 1909, in that, the petitioner did deduct from the actual weight of a carload of wheat, purchased by him on the first day of September, 1909, from James Anderson, one hundred pounds, under a claim of right to do so under and by virtue of a rule and custom of the board of trade of Kansas City, Missouri, contrary to this statute, and under section one of this law this conduct is made a misdemeanor, and the invalidity of the statute is the sole defense to this prosecution."

By the agreed statement of facts it is admitted that the petitioner bought a carload of wheat from Anderson on Kansas City unloading weights, and under the said rule 18 of the Kansas City board of trade deducted one hundred pounds and made settlement for the balance, and that Anderson did not own the grain himself but was acting as a commission man. And that Anderson, the member selling the said carload had never derived any authority from his principal, the owner of said carload of wheat, to make such allowance of one hundred pounds. It is, however, agreed that the petitioner dealt with Anderson in his own right, and had no knowledge that Anderson was not the real owner of the grain, but that he and Anderson understood the sale was made subject to rule 18. It further appears from the agreed statement of facts, that there is a rule of the said board of trade forbidding the disclosures of outside principals and holding the member in all cases as a principal.

Before proceeding further, it is essential to a clear apprehension of the issues involved in this case and to free it from extraneous discussion, that we first understand the nature of the law upon which the prosecution of petitioner is bottomed. The act is short and can be

easily analyzed. Obviously the statute has a twofold aspect, to-wit, a civil, and a criminal side. Thus, in the first sentence of the first section it is declared: "Every sale of grain, seed, hay or coal shall be made on the basis of the actual weight thereof." A failure to comply with this provision is nowhere made penal, and it relates only to the civil rights of the parties to a sale or contract of sale. Allied to this civil feature of the act is the further provision in section two of the act, which provides: "No agent or broker selling any grain, seed, hay or coal shall have authority *under claim or right to do so by reason of any custom or rule of board of trade,* to sell any grain, seed, hay or coal only on the basis of the actual weight thereof, and any contract of sale of any grain, seed, hay or coal made in violation of this act shall be null and void." So that, brought into juxtaposition we have: first, simply a provision that all sales of grain shall be made on the basis of its actual weight, and then, that no broker or agent dealing in grain shall have any authority *by virtue of any custom or rule of board of trade to sell grain* consigned to him or for another, except upon the basis of its actual weight, and if he does, the contract shall be null and void. These are purely civil features of the law and they are in no sense penal. On the other hand, the statute has a distinct criminal aspect. In the second clause of the first section, it ordains: "Any purchaser of grain, seed, hay or coal, who shall deduct any amount from the actual weight or measure thereof, *under claim of right to do so, by reason of any custom or rule of a board of trade, or any pretense whatsoever,*" shall be deemed guilty of a misdemeanor, and shall be subject to a fine of not less than ten nor more than one hundred dollars for each offense. Thus we have a clearly defined criminal offense, complete in and of itself, denounced by the statute, and falling fully within the title of the act.

What then is the question presented to us? Is it the validity of any civil contract as to the weight of grain? Not at all. The defendant is being prosecuted by the State for a violation of the criminal feature of this law, which prohibits him as a purchaser of grain, seed, hay or coal from deducting any amount from the actual weight thereof, *under a claim of right to do so by virtue of a custom or rule of a board of trade.* He has not asserted and does not claim that he has any contract with the seller to deduct the one hundred pounds from the weight of the car of wheat, but lays claim to such deduction *only by virtue of the said rule 18 of the Kansas City Board of Trade,* and this is the offense for which he is being prosecuted. And he claims exemption therefrom, because he says the act is unconstitutional because it violates his freedom of contract, because the statute says *all sales* shall be made on the basis of actual weight. In our opinion the validity of this provision as to actual weight is not involved in this case, and this court is not required upon this record to determine the constitutionality of that feature of the act, and defendant is in no attitude to demand a decision thereon, because its solution would neither aid nor injure him. This court has time and again held that it will not pass upon the constitutionality of an Act of the Legislature until the rights of someone can be affected by our judgment. [State v. Hathaway, 106 Mo. l. c. 240; State v. Seebold, 192 Mo. l. c. 730, 731; State v. McIntosh, 205 Mo. l. c. 604.] It will be time enough to consider the validity of the civil features of this act when the validity of some contract as to the weight of grain is involved in some action which requires the determination of the constitutionality of these portions of the act relating to them. They are not involved in this proceeding, which is a prosecution for a violation of the only penal provision in the law and even if invalid would not render the penal clause void, because it can stand on its validity and is not de-

pendent upon the others. The Legislature in this second clause of section one of the act denounces and strikes at a custom and a rule of the board of trade which arbitrarily assumes a right to take from every shipper of grain, seed, hay or coal one hundred pounds of every carload thereof, sold on said board, without his knowledge or consent, or if known to him, he is powerless to prevent or obtain any adequate redress. In a concise form, the contention of petitioner is that the General Assembly of this State is powerless to prevent the practice of the Kansas City Board of Trade in taking and appropriating to its members one hundred pounds of the weight of every carload of wheat purchased by them on said board of trade, whether the same be clean or contains dirt, without the knowledge or consent of the consignor thereof, solely by virtue of this rule or pretense to that effect, made by itself, and without other authority, and that the said custom and rule cannot be abrogated by the General Assembly of this State.

That the inspection and regulation of weights and measures are within the police power of the States, and laws passed by the Legislature for such inspection and regulation requiring dealers and traders to conform thereto, and for the appointment or election of officers or inspectors thereunder, are in the nature of police regulation and not repugnant to the Constitution of the United States or of this State can no longer be doubted. [Pittsburg Coal Company v. Louisiana, 156 U. S. 590; 30 Am. and Eng. Ency. Law (2 Ed.), 451 and cases therein cited.] Legislation along these lines is found in almost every country, the underlying purpose of which is to secure uniform weights and measures and to guard the people at large against defective and uncertain weights and measures and fraudulent practices connected therewith. While the act we are called to construe in this case is not aimed at fraudulent and illegal weighing of the commodities named therein, it

is aimed at practices which are closely akin to fraudulent weighing. [State v. Wilson, 61 Kas. 32; Cooley on Const. Lim. (6 Ed.), 744.] Of what benefit would it be to the shipper of grain to the grain markets like Kansas City, to be assured that their grain was properly weighed, if after it had been correctly weighed, the toll of one hundred pounds to the carload or any other amount, which the board of trade might determine, should be taken without the knowledge or consent of the shippers by virtue of this so-called rule or practice? The result to him will be the same as if fraudulent scales were used by which his grain was made to weigh one hundred pounds less on the carload, without his knowledge or consent.

The inhibition of this act is against the deduction of any amount from the actual weight or measure *under claim of right to do so by reason of any custom or rule of the board of trade, or by any pretense whatsoever.* This is the unequivocal language of the act itself, and the agreed statement of facts demonstrated that the board of trade, by section 18 of its rules, claims the right to have an allowance of one hundred pounds per car on all grain bought by the members of the board of trade from the Kansas City unloading weights, and in this case, the petitioner deducted one hundred pounds from the carload of wheat bought by him from Anderson on the first day of September, 1909, under and by virtue of this rule 18 *alone,* and not by virtue of any contract made with the shipper whom Anderson represented in the sale, and the agreed statement further shows that Anderson had never apprised his principal of this rule and this custom and obtained his consent to such a deduction from the actual weight of the wheat. Obviously this legislation is aimed at this rule and this custom which the board of trade has made for itself.

With all due respect to my brethren who take a different view of this case, I am clearly of the opinion

that the Legislature had the right to enact this law to prevent and to abolish this self-imposed rule of the board of trade, and in so doing it but exercised a part of the legislative power of the State to prevent unfair and fraudulent practices in the sale of grain consigned to the Kansas City market. That a custom of usage among merchants or others as to what shall constitute a "ton" or other unit of weight can be abolished by the Legislature has been adjudged wherever that question has been raised. [Green v. Moffett, 22 Mo. 529; Evans v. Myers, 25 Pa. St. 114; Noble v. Durell, 3 T. R. 271; St. Cross v. Howard, 6 T. R. 338; Mays v. Jennings, 4 Hum. (Tenn.) 102; Harris v. Rutledge, 19 Ia. 388.]

Tiedeman in his work on State and Federal Control of Persons and Property, vol. 1, p. 260, says: "A fraud is, of course, a trespass upon another's private rights, and can always be punished, when committed. It is therefore but rational to suppose that the State may institute any reasonable preventive remedy, *when the frequency of the frauds, or the difficulty experienced in circumventing them,* is so great that no other means will prove efficacious. Where, therefore, police regulations are established, which give to private parties increased facilities for detecting and preventing fraud, as a general proposition, these laws are free from all constitutional objections. Laws which provide for the inspection and grading of flour, the inspection of tobacco, the inspection and regulation of weights and measures, the regulation of weight of bread, requiring all lumber to be surveyed by a public surveyor, providing for the weighing of coal and other articles of heavy bulk on the public scales, are constitutional exercises of police power, so far as they permit one party to compel the other to comply with the regulation, in the absence of their agreement to the contrary. For example, it is permissible for a statutory regulation to provide for standard weights and

measures, and to compel their use, when the parties have not agreed upon the use of others." In People v. Wagner, 86 Mich. 594, an ordinance of the city of Detroit providing that all bread manufactured by the bakeries of the city for sale, shall be made into loaves of one, two and four pounds, and no other, and forbidding them to sell or exhibit for sale any bread that shall be deficient in weight, was assailed as unconstitutional, but was sustained by the court. The court said: "The police power of a State is not confined to regulations looking to the preservation of life, health, good order and decency. Laws providing for the detection and prevention of imposition and fraud, as a general proposition, are free from constitutional objection. [Tiedeman's Limitations of Police Powers, sec. 89, p. 208.]" And it is on this principle that the oleomargarine acts and the milk ordinances of St. Louis and other cities, have been sustained. That the act in this regard is clearly within the police power of the State, we think there can be no doubt. In the first place it aims at nothing but simple, common honesty.

But as already said the provision of the act which petitioner is charged with having violated is that part thereof which prohibits any purchaser of grain from deducting any amount from the actual weight under any claim of right to do so by reason of any custom or rule of the board of trade, and it is the rule of the Kansas City Board of Trade at which this act is really aimed. The petitioner claims that this act is unconstitutional because it prohibits him from deducting an arbitrary amount, to-wit, one hundred pounds, from each and every car of grain irrespective of the fact whether or not it actually contains any dirt or other foreign substance. While conceding in the agreed statement of facts that there is no method of accurately determining the percentage of such foreign matter and dirt, he assumes that there will be an average of one hundred pounds to each car. He admits that in grading wheat,

dirt and foreign matter are taken into account in determining the value of the grain, but the Kansas City Board of Trade has arbitrarily added to this and deducted one hundred pounds from every car, so that if A shipped a car of grain to Kansas City to a member of the board of trade, which was entirely free from dirt or foreign matter, under this rule one hundred pounds would be deducted and he loses the value of this one hundred pounds and receives no compensation therefor, but is told that he must submit to this because some other shipper may ship a carload of grain containing two hundred pounds of dirt or foreign matter; thus the grain of A which contains no dirt is taken without compensation and the man who shipped a carload of grain with two hundred pounds of dirt suffers a deduction of only one hundred pounds. When it is considered that Kansas City is one of the great grain markets of the world; that into its elevators and warehouses go the wheat and grain from Oklahoma, Kansas and Western Missouri, annually to the amount of millions of bushels, and that the producers of grain are to a large extent restricted to it as the most accessible, if not practically the only market, for the grain of those States, it requires but little calculation to estimate the extent of the toll which this rule 18 of the board of trade exacts of the shippers of the grain to the commission merchants of that city; neither does it involve any strength of imagination to see that this toll or deduction from the grain shipped to said city falls, not upon the local shippers in those States, but upon the producer whose wheat or other grain must suffer this deduction. When as we know from the general laws of trade, and it is admitted by the agreed statement of facts, that wheat is graded when offered for sale, and that when fixing its grade the dirt or other substances is taken into account and its value fixed with reference thereto, the arbitrary deduction of one hundred pounds from the weight of each carload of wheat or other

grain, whether it be clean or not, struck the Legislature as utterly unreasonable and without justification, and that it is but a "pretence" as the statute denominates it, for an unlawful exaction. When it is considered that this exaction falls upon the producer who in the end must suffer for the loss, and that it is impracticable for each producer to prevent the wrong, because he must sell on the markets afforded him and must submit to the condition imposed, the injury, owing to the large number of producers, is to the public as well as the individual producer. In view of the wide extent of such an exaction, it falls within "the rule that whenever the public [or the law-making power] deems an act of private wrong to be of a nature requiring its intervention for the protection of the individual it holds the act punishable at its own suit; in other words, it makes it a crime. [1 Bishop's New Criminal Law, sec. 234.] It seems to us that an act of the Legislature so inherently right in itself according to the laws of fair dealing and morality, needs no extended reasoning to show that it is clearly within the legislative power conferred upon the General Assembly by the Constitution. It prohibits merely the taking of one man's property by another without compensation. It imposes no unjust burden upon the purchaser, but simply inhibits his deducting from the wheat he purchases, a part thereof which he would take without paying the seller therefor, by virtue, not of any agreement with the seller, but by virtue of a rule made by an association of which he is a member.

The business of the board of trade and its members in the handling, buying and selling of the grain is such that the public has an interest therein and is so largely affected thereby, that the Legislature controlling it is justifiable, under the decisions of the Supreme Court of the United States in Munn v. Illinois, 94 U. S. 113; Budd v. New York, 143 U. S. 517 and Brass v. North Dakota, 153 U. S. 391.

The Legislature regarded the said rule as a pretence, that is to say, a pretext, something held out as real when it is not so, a deception, and accordingly made it a misdemeanor in order to prevent it, and of its power to punish it as such we think there can be no doubt.

Petitioner insists that by prohibiting him from making the deduction on one hundred pounds his property is taken without due process of law. We agree with the Attorney-General that he has reversed the conditions. To strike down this act will be to permit him to continue to take the shipper's property without due process of law, and without any compensation therefor.

Without further elaboration, we are of the opinion that this act is a valid one and it is wisely aimed to prevent unjust and unfair practice and to repeal and nullify a rule of the Board of Trade which is unjust and unfair and contrary to good morals and fair dealings, and the act offends against no provision of the Constitution.

As to the objection that the act does not respond to its title, we think it is without merit or weight. We think the act with which petitioner is charged, to-wit, that of deducting one hundred pounds from the weight of the ordinary carload of wheat purchased by him of Anderson, without any other authority than that of rule 18 of the Board of Trade permitting him to do so, aptly falls within the title of the act, whose purpose is declared therein to prevent fraud in the purchase and sale of grain and other commodities.

It follows from what we have said that the petitioner is not entitled to be discharged from the information in this case and that he should be remanded to the custody of the marshal in order that prosecution may proceed according to law, and it is so ordered.

*Burgess, Lamm* and *Woodson, JJ.,* concur; *Woodson, J.,* in a concurring opinion in which *Gantt, Burgess*

and *Lamm, JJ.,* concur. *Valliant, C. J., Fox* and *Graves, JJ.,* dissent; *Graves, J.,* in a dissenting opinion in which *Valliant, C. J.,* and *Fox, J.,* concur. *Fox, J.,* also files dissenting opinion, in which *Valliant, C. J.,* and *Graves, J.,* concur.

## SEPARATE CONCURRING OPINION.

WOODSON, J.—I concur in the views of Judge GANTT expressed in this case for the additional reasons that the design the Legislature had in passing the act in question was two-fold: first, by section one, to prevent brokers from agreeing with the purchasers of wheat on boards of trade to deduct any part therefrom without authority from the owner to so do, notwithstanding the existence of a rule or custom to the contrary. It cannot be seriously contended that said section is unconstitutional for that reason. The books are full of cases upholding the validity of such laws.

The second purpose the Legislature intended to accomplish by the passage of this act was to prevent the purchaser of wheat on the floors of exchanges from deducting any quantity from the amount so purchased where the contract of purchase does not authorize such deduction. In other words, the act was simply designed to prevent one person from taking the property of another without compensation and without his consent. That certainly is a valid law, for the reason that it is based upon express provisions of both the State and Federal constitutions, which provide that private property shall not be taken for private use with or without just compensation.

The clear import and meaning of the rule in question is to authorize the purchaser of wheat "on change" to take private property without the owner's assent and without compensation, which was being done under this rule at the time of the passage of this act. By

the second section of this act the Legislature intended to prevent that wrongful practice.

In the case at bar, the agreed statement of the facts' show that the broker who sold the wheat mentioned therein had no authority in fact to authorize House, the petitioner, to deduct the hundred pounds of wheat mentioned from the quantity purchased by him. Notwithstanding his lack of authority, the petitioner deducted that hundred pounds and now retains it without paying for it. This act of the Legislature declares that act of the petitioner to be a misdemeanor and punishable by fine. In my judgment that is a valid law and should be enforced.

Suppose, for instance, the rule in question instead of being simply a rule of the board of trade had been an act of the Legislature, and had provided just as the rule in effect does, that all purchasers of wheat "on change" may without authority from the owners thereof deduct from each carload purchase the sum of one hundred pounds without compensation, would or could it be contended that such an act would be constitutional? Certainly not. That being true, then clearly the rule itself for stronger reasons is void, and the Legislature unquestionably has the authority not only to fine but also to imprison all who take property of others without their consent.

If this board of trade has the authority to adopt the rule in question, deducting one hundred pounds from each carload purchase made upon its floors, then clearly by virtue of the same authority it has the power to deduct from each sale two hundred pounds or any other quantity deemed proper, only limited by the avarice and greed of a majority of its members.

In answer to a question propounded by the writer to counsel for the petitioner during the oral argument of this cause, he stated in response thereto that there was sold on an average on the floor of the Kansas City Board of Trade five hundred cars of wheat a day.

If we deduct from each car of wheat so sold one hundred pounds for each day in the year, it will show that the owners of wheat are annually, by this rule, deprived of three hundred and four thousand one hundred and sixty-six bushels, and that, too, without their consent and without compensation. If the same rule be extended to St. Louis, St. Joseph and other grain markets of the State, then the quantity will be swollen to probably a million bushels.

This rule is wrong and vicious and should be condemned, as the Legislature has undertaken to do by this act; and this act is wise and just and should be upheld and enforced. *Burgess, Gantt* and *Lamm, JJ.*, concur. *Valliant, C. J.*, and *Fox* and *Graves, JJ.*, dissen t.

## DISSENTING OPINION.

GRAVES, J.—I cannot concur in the opinion of the majority and my reasons therefor are expressed in the following:

By information duly filed on September 21, 1909, by the prosecuting attorney of Jackson county, Missouri, R. J. House was charged with the violation of a legislative act of this State entitled, "An Act to prevent fraud in the purchase and sale of grain and other commodities." [Laws 1909, p. 519.] In said information it is charged that he "on the first day of September, 1909, in the county of Jackson, State of Missouri, did purchase from one James Anderson, one carload of wheat by weight, and did then and there willfully and unlawfully, from the actual weight of the said wheat so by him purchased, take and deduct one hundred pounds, by the said R. J. House, pretending and claiming to have the right to make such deduction, and to have and keep the said one hundred pounds so deducted free of charge and cost to him under and by virtue of a rule and custom of the board of trade of Kansas City, Missouri, contrary to the

form of the statute in such cases made and provided, and against the peace and dignity of the State.'' Upon this information *capias* was issued and said House, who is and was a member of said board of trade of Kansas City, Missouri, was arrested.  Upon his arrest he applied to this court for a writ of habeas corpus, the object and purpose of which was to test the validity of such Act of the General Assembly.  Upon the filing of such application the writ was issued and made returnable at a date named, and return thereto was duly made.  Counsel, much to be commended, have agreed upon a statement of facts, around which all the legal questions cluster.  The statement of facts reads:

''Without admission of either party as to the relevancy of any particular fact herein set forth, the following facts are agreed upon between parties:

''There are competitive grain markets at Galveston, Texas, Chicago, Illinois, Omaha, Nebraska, Atchison and Wichita, Kansas, and St. Louis, St. Joseph and Kansas City, Missouri.  That Kansas City is a primary grain market.  That a very slight difference in price or condition will influence the market course of grain.

''That the board of trade of Kansas City, Missouri, is a voluntary organization of buyers and sellers of grain and provisions, supported by dues and assessments and maintained for the purpose of furnishing a marketing place where such persons can meet and, under rules of safety and convenience, transact such business.  Its objects are:  'To maintain a board of trade to promote uniformity in the customs and usages of merchants; to inculcate principles of justice and equity in business; to facilitate the speedy adjustment of business disputes; to inspire confidence in the business methods and integrity of the parties hereto; to collect and disseminate commercial and economic information, and generally secure to its members the benefits of co-operation in the furtherance of their

legitimate pursuits, and to promote the general welfare of Kansas City.'

"Its members are governed by rules and regulations, enacted by the members, and which form part of the written contract of association between them.

"This organization provides for the exclusive use of its members a trading floor where grain is bought and sold only under and according to said rules. Three of said rules are:

" 'Sec. 16. The weight supervising committee shall have supervision, through the weight department, of the unloading of all cars unloaded at all elevators, mills, warehouses, transfer and team tracks, within the jurisdiction of this board, and shall cause the same to be thoroughly swept and cleaned when unloaded. Sweeping or cleaning of cars subsequently by any operator or employee of any elevator, mill, warehouse, transfer or team track, or by any person or persons under agreement with the same; or the buying or receiving of any such sweepings or cleanings by any member of this association is prohibited.

" 'Sec. 17. Violations of any of the provisions of section 16 of this article shall subject the member so violating to a fine of fifty dollars for the first offense, to a fine of one hundred dollars for the second offense, to expulsion and forfeiture of membership for the third offense.

" 'Sec. 18. On all grain bought by members of the Kansas City Board of Trade, and on which Kansas City unloading weights are given, an allowance of one hundred pounds per car shall be made to the buyer, to cover loss on account of dirt and other foreign matter.'

"That said board of trade maintains a bureau of weights which strictly enforces rule 16.

"That rules 16 and 17 were enacted to secure the seller the full weight of the entire contents of the car and rule 18 to secure the buyer from loss through dirt

and foreign matter in or swept out with the grain which was unloaded at Kansas City. Before grain is sold it is graded. One of the considerations in grading is the dirt and foreign matter in the grain. Experience has shown that there is a loss from dirt and foreign matter, varying with different cars, which is not fully taken care of in the grade. That there is no method in use of accurately determining the percentages of such foreign matter and dirt, and the one hundred pound quantity was taken as a fair average.

"The members of said board of trade buy and sell sometimes as commission men for outsiders, and sometimes for their own account, and it is impossible to tell without inquiry whether a buyer or seller is acting for himself or for some one else. The buying and selling of grain on the floor of said board of trade is, as in all other markets, based upon the constantly and rapidly fluctuating market prices in that and the other principal grain markets. There is no time nor opportunity to ascertain the capacity (principal or agent) in which a member is acting when he buys or sells, and, if he be in reality acting as agent, no opportunity to investigate the financial standing of the real principal. Because of this condition and also to secure the prompt and faithful performance of all such contracts of sale, there is a rule of said board of trade forbidding the disclosure of outside principals and holding the member in all cases as the principal. There are also rules making a membership responsible for the faithful performance of such contracts.

"That the State Railroad and Warehouse Commission has in force a rule requiring cars unloaded at Kansas City to be cleanly swept.

"That the method of making the reduction is to weigh the loaded car; then, after emptying and cleanly sweeping the car, to weigh the car; the difference in these two weights is entered on the account sales as the weight of the carload of grain, the deduction of one

hundred pounds being also noted on that slip and settlement made for this balance. That is, the weight of the entire contents of the car is shown and also the one hundred pound deduction on the face of the account sales given the seller.

"That upon the first day of September, 1909, your petitioner bought upon the trading floor of said board of trade and from a member thereof, a carload of wheat on Kansas City unloading weights. In accordance with the above method, and under said rule 18, he deducted one hundred pounds and made settlement for the balance.

"The member selling this grain did not own it, but was acting as a commission man. He, however, dealt with petitioner as in his own right, and your petitioner had no notice or knowledge that such seller was not the real owner of the grain. Nothing had been said between the member selling and his principal as to the allowance of the one hundred pounds.

"Both your petitioner and the seller understood at the time of sale that it was made subject to this rule."

The full statute reads:

"An act to prevent fraud in the purchase and sale of grain and other commodities.

"Be it enacted by the General Assembly of the State of Missouri, as follows:

"Section 1. Every sale of grain, seed, hay or coal shall be made on the basis of the actual weight thereof, and any purchaser of grain, seed, hay or coal, who shall deduct any amount from the actual weight or measure thereof under claim of right to do so by reason of any custom or rule of a board of trade or any pretense whatsoever, shall be deemed guilty of a misdemeanor, and shall be subject to a fine of not less than ten dollars nor more than one hundred dollars for each and every offense.

"Sec. 2. No agent or broker selling any grain, seed, hay or coal shall have authority, under claim or

right to do so by reason of any custom or rule of board of trade, to sell any grain, seed, hay or coal only on the basis of the actual weight thereof, and any contract of sale of any grain, seed, hay or coal made in violation of this act shall be null and void.

"Approved June 8, 1909."

Counsel for Mr. House urge several reasons against the validity of the law, each of which will be noted in the course of the opinion. His counsel ask his discharge, and the State holds that he should be remanded to be tried under the information. Such sufficiently states the cause for a discussion of the legal questions.

I. We have perhaps set out more of the details in the statement than were required. One point raised is that this law interferes with the sacred right of individuals, *sui juris,* to contract as they please, so long as such contracts are not condemned upon grounds of public morals, public policy and things of like character. The petitioner contends that this right is violated—the State, through the learned Attorney-General, contra. The question is not one without difficulties. It can only be determined by an analysis of the law, itself. The question can best be discussed by illustrations. Suppose that a member of this court desired to buy a wagonload of wheat upon the streets of Jefferson City, and upon examination found that there was a large amount of foreign substances in said load of wheat, and for that reason demanded that before he would pay the market price of wheat, a certain per cent of allowance in weight should be allowed for the foreign substances, would the statute prevent a contract of that character? That we would have a right to so contract can hardly be doubted, if the seller was *sui juris.* So, to such a question there can be but one answer and that in the affirmative. No law, relating to the right of contract, can compel the citizen to pay for a thing which he does not get. Nor can a law

prescribe the terms of a contract, and thus prevent one of two parties, fully *sui juris*, from getting even a shade the better of the deal by contract. Unconscionable contracts do not fall within this rule. Now, to an analysis of this law, as to whether or not it would affect a contract of the character supposed, supra.

The first section of the statute says that ''every sale of grain . . . shall be made on the basis of the actual weight thereof, and every purchaser of grain . . . who shall deduct any amount from the actual weight or measure thereof under : . . any pretense whatsoever, shall be deemed guilty of a misdemeanor.''

The term ''any pretense whatsoever'' is a broad one. In the use of it reference is made to a sale of a commodity. A sale presupposes a contract of some kind. Under the statute the sale must be upon the basis of actual weight and *a fortiori* the contract of sale must be likewise. In other words, that which limits the sale must limit the contract with reference to the sale. There can't be a sale, without a contract of sale, and the law which prescribes the terms of one prescribes the terms of the other.

To bring the application closer home, suppose a member of this court desired to purchase a carload of wheat standing upon the unloading track of a railway company in Kansas City, and after such wheat had been graded, and he upon examination found that there were more foreign substances, including dirt, in the wheat than were accounted for by the grading made, could he then, under this law, contract for the deduction of one hundred or two hundred pounds from the weight of the car of wheat in order to get actual justice in the bargain? We think not. Under the statute ''every sale . . . shall be made on the basis of the actual weight,'' and to deduct from such actual weight on ''any pretense whatsoever'' renders a purchaser guilty of a misdemeanor. A sale, as said

above, includes within itself a contract of sale. There can be no sale without a contract of sale, and the prohibition really goes to the contract of sale, and prevents "every sale" (not sales upon boards of trade solely) from being made under a contract by the terms of which the purchaser can agree to give the market price for wheat, provided a reasonable deduction is made for foreign substances.

So, too, if we were purchasing a load of coal upon the streets, much of which load was made up of slate and other foreign substances, we would be guilty of a misdemeanor should we say to the seller, we will pay your price provided you deduct ten per cent of the weight to cover these foreign substances, and the seller accepted our offer, thus completing the sale and the contract of sale.

The relator in this case is being prosecuted under section 1 of the act, the only criminal section thereof. This section we have analyzed and when we recollect, as we must, that there can be no such thing as a sale without a contract of sale, we are forced to the conclusion that the words "every sale" used in such section are equivalent to "every contract of sale." Not only so, the section does not limit itself to sales upon boards of trade, but it applies to "every sale" of the commodities therein mentioned, it matters not when nor where made. This statute clearly strikes at the right of private contract. The first clause compels a purchaser to contract on the basis of the actual weight. Not only so, but it precludes such purchaser from so contracting as to make an allowance for foreign substances. It applies to sales made where there is no grain inspection, as well as places where there is grain inspection. It absolutely leaves the purchasers of grain in small towns and in the country at the mercy of the seller.

The first clause of this statute fixes the terms of every contract of sale so far as the commodities named

are concerned. This clause, which we repeat for the present point, reads: "Every sale of grain, seed, hay or coal shall be made on the basis of the actual weight thereof." No cattle feeder buying light chaffy corn, and corn not cleanly shelled, could contract for a greater number of pounds to the bushel under this statute. In this regard the contract between the two individuals has been fixed by statute. This statute ignores the provisions of the general statute upon weights and measures. The general statute, Revised Statutes 1899, section 10576, passed when legislative freaks and fads were not in vogue, so far as applicable reads: "Whenever the articles hereinafter named shall be sold by the bushel, and no special agreement as to the measurement or weights thereof shall be made by the parties, the bushel shall consist of the following number of pounds, *viz.*:"

In those days we recognized that persons *sui juris* could contract, but in these days it would appear that the State is to assume the right to fix the terms of the contracts between private individuals, whether *sui juris* or not. Under both the State and the Federal Constitutions this power to thus interfere with private contracts is denied. No stronger condemnation of such a law is found than we find from this court in an opinion by SHERWOOD, J., in case of State v. Julow, 129 Mo. 1. c. 175, whereat it is said:

"Here the law under review declares that to be a *Crime*, which consists alone in the exercise of a constitutional right, to-wit, that of terminating a contract, one of the essential attributes of property, indeed property itself, under preceding definitions. Brought to the bar of a court on such a charge, the accused would have been *prejudged* in so far as the *criminality* of the act charged is concerned; no question could there be made or admitted as to the quality of the act; that would have been settled by the previous legislative declaration, and it would only remain to find the fact

as charged, in order to declare the guilt as charged. But the fact as charged as already seen, is *not a crime,* and will not be a crime, so long as constitutional guarantees and constitutional prohibitions are respected and enforced.

"If an owner, etc., obeys the law on which this prosecution rests, he is thereby deprived of a right and a liberty to contract or terminate a contract as all others may; if he *disobeys* it, then he is punished for the performance of an act *wholly innocent,* unless indeed the doing of such act guaranteed by the organic law, the exercise of a right of which the Legislature is forbidden to deprive him, can, by that body, be conclusively pronounced criminal. We deny the power of the Legislature to do this; to brand as an *offense* that which the Constitution designates and declares to be *a right,* and therefore an *innocent act,* and consequently we hold that the statute which professes to exert such a power is nothing more nor less than a *"legislative judgment"* and an attempt to deprive all who are included within its terms, of a constitutional right without due process of law. In support of these views see State v. Loomis, 115 Mo. 307; Com. v. Perry, 155 Mass. 117; Godcharles v. Wigeman, 113 Pa. St. 431; State v. Goodwill, 33 W. Va. 179; In re Jacobs, 98 N. Y. 98; People v. Gillson, 109 N. Y. 389; Millett v. People, 117 Ill. 294; Tilt v. People, 27 Chicago Leg. News, 270."

Equally strong is the language of Burgess, J., in the more recent case of State v. Tie & Timber Co., 181 Mo. l. c. 559: "The right to labor or employ labor, and make contracts with respect thereto, upon such terms as may be agreed upon, is both a liberty and property right, and is included in the guaranty of the Constitution which provides 'that no person shall be deprived of life, liberty or property without due process of law.' [Sec. 30, art. 2, Constitution.] Nor can such right to contract be arbitrarily interfered with, but may be subject to limitations growing out of duties

which the individual owes to society, but such limitation must be upon some reasonable basis, and not arbitrarily. [Ritchie v. People, 155 Ill. 98.]''

The section of the statute under review in the Tie & Timber Company case affected the right of an employer to make contracts with his employees. There can be no difference between purchasing labor and purchasing commodities. The right to contract (which is, as said by SHERWOOD, J., in the Julow case, supra, property, within the constitutional provisions) is involved in both cases. We use the term purchasing labor, because it is so used by PECKHAM, Justice, in Lochner v. New York, 198 U. S. l. c. 56. In that case the learned justice was discussing the effect of a New York law limiting the hours which bakers should work upon the constitutional right to contract. He there said:

''It must, of course, be conceded that there is a limit to the valid exercise of the police power by the State. There is no dispute concerning this general proposition. Otherwise the Fourteenth Amendment would have no efficacy and the Legislatures of the States would have unbounded power, and it would be enough to say that any piece of legislation was enacted to conserve the morals, the health or the safety of the people; such legislation would be valid, no matter how absolutely without foundation the claim might be. The claim of the police power would be a mere pretext— become another and delusive name for the supreme sovereignty of the State to be exercised free from constitutional restraint. This is not contended for. In every case that comes before this court, therefore, where legislation of this character is concerned and where the protection of the Federal Constitution is sought, the question necessarily arises: Is this a fair, reasonable and appropriate exercise of the police power of the State, or is it an unreasonable, unnecessary and arbitrary interference with the right of the individual to his personal liberty or to enter into those contracts

in relation to labor which may seem to him appropriate or necessary for the support of himself and his family? Of course the liberty of contract relating to labor includes both parties to it. The one has as much right to purchase as the other to sell labor.

"This is not a question of substituting the judgment of the court for that of the Legislature. If the act be within the power of the State it is valid, although the judgment of the court might be totally opposed to the enactment of such a law. But the question would still remain: Is it within the police power of the State? and that question must be answered by the court.

"The question whether this act is valid as a labor law, pure and simple, may be dismissed in a few words. There is no reasonable ground for interfering with the liberty of person or the right of free contract, by determining the hours of labor, in the occupation of a baker. There is no contention that bakers as a class are not equal in intelligence and capacity to men in other trades or manual occupations, or that they are not able to assert their rights and care for themselves without the protecting arm of the State, interfering with their independence of judgment and of action. They are in no sense wards of the State. Viewed in the light of a purely labor law, with no reference whatever to the question of health, we think that a law like the one before us involves neither the safety, the morals nor the welfare of the public, and that the interest of the public is not in the slightest degree affected by such an act."

The contention of the State in this case is that the law is a reasonable exercise of the police power of the State, but as such we cannot so see it. Boiled down to its essence, this law simply says that no contract for the sale and delivery of certain commodities can be made between two persons *sui juris* unless the actual weight of the carload or other bulk of grain be taken as the basis of the contract. The making of contracts

of sale contrary to the provisions of this act does not affect the safety, health, morals or general welfare of the public—the peculiar wards of the police power. It simply affects private contracts and as such violates both State and Federal constitutional provisions. Speaking of the scope of the police power, Mr. Justice HARLAN, in Adair v. United States, 208 U. S. 1. c. 173, said: "There are, however, certain powers, existing in the sovereignty of each State in the Union, somewhat vaguely termed police powers, the exact description and limitation of which have not been attempted by the courts. Those powers, broadly stated, and without, at present, any attempt at a more specific limitation, relate to the safety, health, morals and general welfare of the public."

In the Adair case, supra, a Federal statute relating to employer and employee was under consideration. Adair, who was master mechanic of a railway corporation, was charged with having discharged one Coppage because of his connection with a labor organization in violation of the 10th section of the Act of Congress of date October 1, 1888. In discussing this statute under the Constitution, Mr. Justice HARLAN in the Adair case, further said: "While, as already suggested, the rights of liberty and property guaranteed by the Constitution against deprivation without due process of law, is subject to such reasonable restraints as the common good or the general welfare may require, it is not within the functions of government—at least in the absence of contract between the parties—to compel any person in the course of his business and against his will to accept or retain the personal services of another, or to compel any person, against his will, to perform personal services for another. The right of a person to sell his labor upon such terms as he deems proper is, in its essence, the same as the right of the purchaser of labor to prescribe the conditions upon which he will accept such labor from

227 Sup—42

the person offering to sell it. So the right of the employee to quit the service of the employer, for whatever reason, is the same as the right of the employer, for whatever reason, to dispense with the services of such employee. It was the legal right of the defendant Adair, however unwise such a course might have been, to discharge Coppage because of his being a member of a labor organization, as it was the legal right of Coppage, if he saw fit to do so, however unwise such a course on his part might have been, to quit the service in which he was engaged, because the defendant employed some persons who were not members of a labor organization. In all such particulars, the employer and employee have equality of right, and any legislation that disturbs that equality is an arbitrary interference with the liberty of contract which no government can legally justify in a free land.''

And so say we in the case at bar. Buyers and sellers of the commodities mentioned in our statute are upon equal footing. They should have equal rights in the matter of making contracts of purchase and sale. The State is going beyond a reasonable and legitimate exercise of its police power when it attempts to prescribe the terms or any portion of the terms of such contracts between private individuals. Other cases are cited in the briefs, but we will not further burden this opinion. The very first clause of the statute in question fixes at least one of the terms of every contract of sale as to the commodities mentioned. Such statute is neither a reasonable nor a legitimate exercise of the police power of the State, but in violation of constitutional provisions, as found in both the State and the Federal constitutions, and is one which tramples down the rights of the individual to make contracts for himself.

Not only so, but it does this in the interest of one of the contracting parties, and against the interest of the other. Such statutes have universally been de-

clared vicious in character and tendency. For the reasons above expressed we hold the statutes under which the relator is being prosecuted to be void.

II. There is another reason why this statute should be declared void. The body of the act in nowise responds to the title. The title thus reads: "An Act to prevent fraud in the purchase and sale of grain and other commodities." The body of the act as we have shown, simply goes to the character of the contract which must be made between buyer and seller. In its last analysis, the body of the law simply provides that the actual weight of the grain shall be taken as the basis of the contract of sale, and if the purchaser does not so take it he is guilty of a misdemeanor. There is not a line in the act which describes a fraudulent transaction. It is not a fraud for two parties *sui juris* to agree that one will sell and the other will buy a carload of grain, provided that 100 or 200 pounds be taken from the weight to cover loss occasioned by the presence of foreign substances. It is not a fraud for two persons to agree that one will sell and the other buy a wagon-load of coal at so much per hundred provided eighty-five pounds instead of eighty pounds be allowed to the bushel, in order to cover loss from apparent foreign substances in the coal. Yet these are the very transactions involved in the body of this law. There is no reasonable connection between these transactions and the subject-matter of fraud. The law therefore does not fall within the purview of the enacting clause or title—and such a law cannot stand.

Nor can the Legislature make that a fraud which within itself is not a fraud. To such things the same rule will apply as is applied to nuisances. Speaking to the question of nuisances, this court in City of St. Louis v. Galt, 179 Mo. l. c. 18, said: "Of course, even under such broad powers, it is not competent for the city to declare that to be a nuisance which is not, and cannot from its nature, be a nuisance in fact."

And in St. Louis v. Packing Company, 141 Mo. l. c. 383, GANTT, J., said: "Notwithstanding the broad terms in which the power is given to declare nuisances, it is not competent for the city to declare that a nuisance which is not so in fact."

If the body of this act falls within the purview of its title it is because the Legislature has declared that if two parties enter into a contract for the purchase and sale of grain and other commodities on the basis of weights other than the actual weights, such act of the two parties, *sui juris,* is a fraud. The Legislature cannot declare and make that a fraud, which in fact is not a fraud. Nor can the State make an act criminal when the Constitution permits such act to be done. [State v. Julow, 129 Mo. l. c. 175.]

For these reasons the entire act is void.

III. Learned counsel for the State have analyzed the statute and thus state it:

"The whole act, stripped of its verbiage, and 'boiled down,' simply means this:

"First: That all sales of grain, seed, hay and coal in this State shall be made on the basis of their actual weight.

"Second: That any purchaser of grain, seed, hay or coal, who shall deduct any amount from the actual weight or measure thereof, under claim of right to do so by reason of any custom or rule of a board of trade or any pretense whatsoever, shall be guilty of a misdemeanor and punished by fine.

"Third: That no agent or broker shall have any authority by reason of any custom or rule of a board of trade, to sell any grain, seed, hay or coal, except on the basis of the actual weight thereof, and any sale made in violation thereof shall be null and void."

He adds, however: "The act was not leveled against the right to contract in any manner or form." At this point the learned counsel tread the pathway of error. The first subdivision of their analysis shows

the error. This first subdivision we have discussed above, quoting the exact language of the act. That part of the act says that no sale can be made except upon actual weights. No sale can be made without a contract between two parties, *sui juris*. Under this first clause of the statute parties must contract upon the basis of actual weights. If this is not then a statute fixing the basis of a private contract between two persons, *sui juris*, we misconceive what we think to be plain English terms.

If this first clause stood alone, and was not violative of constitutional provisions, no valid sale of the commodities named could be made except on the basis of actual weight, and as all sales presuppose a contract of sale, no valid contract could be made upon any other basis. The more we outline this statute the more firmly fixed become our views to the effect that it is an unwarranted invasion of the personal right to contract. If the State cannot make an act, which is authorized by the Constitution, criminal, it cannot declare fraudulent an act likewise authorized by the Constitution.

So concluding, we think the statute, under which relator was arrested, to be void and relator should be discharged. *Valliant, C. J.,* and *Fox, J.,* concur—the latter in a separate opinion, in which *Valliant, C. J.,* and the writer concur.

## SEPARATE DISSENTING OPINION.

FOX, J.—I fully concur in the views expressed by Judge GRAVES upon the propositions involved in this proceeding; hence will be content with adding a few words concerning the interpretation of section 1, Laws 1909, p. 519, upon which the prosecution of the petitioner was predicated.

Section 1 provides that "every sale of grain, seed, hay or coal shall be made on the basis of the actual

weight thereof, and any purchaser of grain, seed, hay or coal, who shall deduct any amount from the actual weight or measure thereof under claim of right to do so by reason of any custom or rule of a board of trade or any pretense whatsoever, shall be deemed guilty of a misdemeanor and shall be subject to a fine of not less than ten dollars nor more than one hundred dollars for each and every offense.''

It is to the provisions of this section that the State must look for support in the prosecution of the petitioner. It is insisted that this section should be divided into sentences and clauses, by reason of which the respective features of the section will be made to appear, that is to say, the civil and criminal aspects embraced in the section.

It is sufficient to say upon this insistence that if that section is divided into sentences or clauses, then it must be done by the court, for manifestly the law-making power did not embrace separate clauses, not even separate sentences. The entire section is embraced within one sentence, and in my opinion can only be construed in its entirety. Clearly, the General Assembly sought by the provisions of section 1 to create a misdemeanor concerning the subject of sales of grain, seed, hay or coal, and all the terms employed in that section, have, in their final analysis, application alone to the criminal offense that is sought to be created. The provision of that section that ''any purchaser of grain, seed, hay or coal, who shall deduct any amount from the actual weight or measure thereof . . . shall be deemed guilty of a misdemeanor,'' is embraced in the same sentence and is directly connected with the preceding terms that ''every sale of grain, seed, hay or coal shall be made on the basis of the actual weight thereof.'' In other words, the purchaser as spoken of in the section has reference to a purchaser by reason of a sale made on the basis as provided by the terms last above quoted. There can be no pur-

chaser without a seller, and there can be no sale without a contract, either express or implied, and under the provisions of section 1 the right of the seller and purchaser to make sales is limited to the terms of the statute, that is, the actual weight or measurement, irrespective of what may be the condition of the commodity sold. From this it logically follows that the same limitation upon the right to make a sale is applicable to and is a burden upon the right to make the contract of sale.

The provision of section 1 which provides that "every sale of grain, seed, hay or coal shall be made on the basis of the actual weight thereof" was not intended by the General Assembly to present simply the civil feature of that section, for manifestly it is the violation of that provision which constitutes the essence of the crime created by section 1. Clearly the purchaser is required under this provision in making his purchase to make it on the basis of the actual weight of the commodity so purchased, and a failure to comply with the terms of this provision is the essence of the offense created by section 1; and the provision that "any purchaser of grain, seed, hay or coal, who shall deduct any amount from the actual weight or measure thereof," serves only to emphasize that it is the violation of the terms of the statute that every sale shall be made on the basis of the actual weight of the commodity that makes the offense. In other words, section 1 in effect provides that every sale of grain, seed, hay or coal shall be made on the basis of the actual weight, and any purchaser who participates in a sale and who shall purchase upon any other basis than that of the actual weight and measure of the commodity under a claim of right to do so by reason of any custom or rule of a board of trade, or any pretense whatever, shall be guilty of a misdemeanor. The provisions of section 1, which provide that "any purchaser  .  .  . who shall deduct any amount from the actual weight

or measure thereof," etc., is only pointing out in detail the manner and method of the violation of the requirements of the statute which provide that all sales of certain commodities shall be made upon the basis of the actual weight thereof.

There can be no such thing as a deduction by a purchaser from the actual weight or measure of the commodity purchased without there was a sale and a contract of sale preceding such deduction, and the sale contemplated is the one suggested by the provisions of the statute that must be made upon the basis of the actual weight of the commodity, and, as heretofore indicated, such sale presupposes some sort of a contract, either express or implied, respecting the commodity sold.

In my opinion, as heretofore indicated, the provisions of section 1 must be construed together, and the terms employed in said section have application to the criminal offense sought to be created by the General Assembly in the enactment of that section.

It is next insisted that section 1 has application alone to sales upon boards of trade. A careful analysis of the provisions of section 1 will demonstrate that its provisions are of much broader significance. It will be observed that this statute in treating of the subject of sales of grain and the other commodities therein mentioned nowhere indicates that it has application alone to sales upon boards of trade. In fact the only instance in which boards of trade are mentioned is that the purchaser cannot justify his deduction from the actual weight of the commodity purchased by reason of any custom or rule of a board of trade or any pretense whatsoever. In other words, the provisions of that section in substance provide, first, that the sale of the grain shall be upon the basis of the actual weight thereof, and that any purchaser who deducts any amount from the actual weight thereof under claim of right to do so by reason of any custom or rule of

Ex parte House v. Mayes.

a board of trade, or any pretense whatsoever, shall be guilty of the offense provided by that section. That is, that no deduction shall be made by reason of any custom or rule of a board of trade or for any other reason or pretense whatsoever. In other words, the provisions of section 1 are applicable to sales made of the commodities therein mentioned either upon boards of trade or otherwise, and if a purchaser makes a deduction in the weight of the commodity purchased by reason of a custom or rule of a board of trade he is guilty of a misdemeanor; and such purchaser is equally guilty of the offense defined by the statute if he makes a deduction upon the weight of the commodity so purchased at a sale (not upon any board of trade) on any pretense or reason whatsoever.

The solution of the proposition confronting us, that is, the proper interpretation of section 1 upon which the prosecution of the petitioner was predicated, must be sought alone by a careful analysis of the terms employed in the statute, and the proposition should not be overshadowed by treating the statute as applicable to the Kansas City Board of Trade and its rules, manner and methods of transacting business.

If this statute invades the rights of the citizens of this State who are fully capable of contracting respecting the sale of their property, then, in my opinion, it should be held invalid. If boards of trade in Kansas City or anywhere else in this State have rules and methods of transacting business that are not in harmony with public interests and morals, doubtless the law-making power will have no trouble in devising some means to regulate them; but their regulation should not be confounded with the rights of the individual citizen who is capable of contracting in the sale and purchase of his property in such manner as his best judgment dictates. In my opinion section 1 should be held invalid.

*Valliant, C. J.,* and *Graves, J.,* concur.